NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**GEOFFREY BARROW, D.C. #462662**
Geoffrey.Barrow@usdoj.gov
**NICHOLAS MEYERS, OSB #222743**
Nicholas.Meyers@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:24-cr-00383-AN |
| v. | **GOVERNMENT'S MOTION REGARDING PRETRIAL DETENTION** |
| **RAMIREZ DUMITRU,** **GIOVANNI SPIREA,** **SANTA-MADALINA COSTACHE** aka Santa-Midalina Costache, **FLORIN MAREATA** aka Florin Santos, **ANITA VADUVA,** **ION PAUL MICLESCU,** **NICOLAS BARBOSU,** **ALBERTO TOMESCU,** **OANA AURA CRISTINA CALDARARU,** **ROBERTA ELENA SARDARU,** **SALVIS FORO DUNCA,** **ANA PATRICIA ESCALANTE,** **JESSICA GONZALEZ,** **EDWIN LIONEL SANTIZO-RALON,** **CRISTINA YESENIA ESCALANTE** aka Cristina Hernandez-Escalante, **EDGAR BASILIO HERNANDEZ, and** **MARTA HERNANDEZ DE ESTRADA;** Defendants. | |

**Government's Motion Regarding Pretrial Detention**             Page 1

## I. INTRODUCTION

Defendants Ramirez Dumitru, Giovanni Spirea, Florin Mareata, Anita Vaduva, Ion Paul Miclescu, Nicolas Barbosu, and Salvis Foro Dunca (collectively, "Defendants") were arrested yesterday within in the District of Oregon and will make an initial appearance and be arraigned on a sixteen count Indictment, which charges Defendants with violations of 18 U.S.C. § 1029, Fraud and Related Activity in Connection with Access Devices; 18 U.S.C. § 371, Conspiracy to Defraud the United States; 18 U.S.C. § 2314, Transportation of Stolen Goods; and/or 18 U.S.C. § 2315, Sale or Receipt of Stolen Goods.[1] For the reasons set forth below, the government respectfully submits that the Court should enter a permanent order of detention pending trial because each of the Defendants presents a danger to the community and a serious risk of flight.[2] *See* 18 U.S.C. § 3142(f)(2).

## II. FACTUAL BACKGROUND

### A. The Conspiracy

Defendants are leaders and organizers of an ongoing multi-state criminal conspiracy that has stolen more than $2.4 million dollars of benefits from hundreds of low-income and food-insecure individuals and families receiving Supplemental Nutrition Assistance Program

---

[1] Defendants Santa-Madalina Costache, Oana Aura Cristina Caldararu, and Roberta Elena Sardaru were also arrested yesterday within the District of Oregon. The government reserves the right to seek detention for each of these defendants after reviewing the Pretrial Services report. The government believe that these defendants are unlawfully present in the United States and have no legitimate employment. They were also actively engaged in the conspiracy and pose a risk of flight and a danger to the community. Seven other defendants— Alberto Tomescu, Ana Patricia Escalante, Jessica Gonzalez, Edwin Lionel Santizo-Ralon, Cristina Yesenia Escalante, Edgar Basilio Hernandez, and Marta Hernandez de Estrada—were also arrested yesterday outside the District of Oregon.

[2] Given the number of Defendants in this matter, the government has not included all relevant facts supporting detention in this Motion. The government will identify additional factors that support detention as to each individual defendant at the detention hearing.

("SNAP") benefits throughout the United States.[3] The conspiracy uses the stolen SNAP benefits to fraudulently obtain large quantities of infant formula and other nonperishable food items from retailers, which are then stockpiled in residences and public storage units. The conspirators then consolidate and package the goods—thousands of pounds of infant formula and other food products—before shipping them across state lines in tractor trailers to be resold on the black market.

B.  The Defendants

The government seeks the pretrial detention of six of the seventeen defendants in the Indictment, each of which are identified below.

- Ramirez Dumitru is a 25-year-old citizen of Romania. Dumitru is unlawfully present in the United States and has no legitimate employment. During this investigation, he has moved from Oregon to California and back to Oregon. On May 24, 2024, California state investigators executed a warrant at Dumitru's residence in Orange County, California where they found skimming devices and EBT account information used by the conspiracy in Oregon and Washington. When Dumitru learned of the warrant, he returned to Oregon and continued to engage in criminal conduct.
- Anita Vaduva is a 36-year-old citizen of Romania. Vaduva is unlawfully present in the United States. She has a criminal history with theft related offenses and open warrants in Florida and Washington. According to the manager of the Aspire apartment complex where Vaduva lives with Miclescu, she owes thousands of dollars in back rent and is in

---

[3] The Supplemental Nutrition Assistance Program, known as SNAP, is a federal program that provides nutrition benefits to low-income individuals and families. SNAP is administered by the United States Department of Agriculture (USDA), under the Food and Nutrition Service. SNAP benefits are limited for use at stores to purchase approved food items. In 1998, the USDA, through the State of Oregon Department of Human Services (DHS) Children, Adults and Families Division (CAF), converted from a traditional paper food stamp coupon system to what is known as an Electronic Benefit Transfer (EBT) card. The EBT card is an access device within the meaning of 18 U.S.C. § 1029(e)(1), in that it is a card containing a series of numbers which can be used to obtain things of value, specifically, eligible food items under the SNAP program. As of October 1, 2008, the official name of the federal Food Stamp Program changed to the Supplemental Nutrition Assistance Program (SNAP), but many people continue to refer to the program and related benefits as the Food Stamp Program and food stamp benefits, respectively.

- eviction proceedings. A large quantity of cash was recovered from her apartment along with skimming devices, cards used to encode EBT data, and a card encoder.
- Ion Paul Miclescu is a 26-year-old citizen of Romania. Miclescu is unlawfully present in the United States and was previously ordered removed. Miclescu has no confirmed employment. He worked fulltime on behalf of the conspiracy and was one of the conspiracy's most prolific users of stolen SNAP benefits. On October 22, 2024, investigators executed a search warrant at the residence he shares with his mother, Anita Vaduva, and recovered skimming devices, cards used to encode EBT data, and a card encoder.
- Salvis Foro Dunca 26-year-old citizen of Romania. Dunca is unlawfully present in the United States. He has no confirmed employment. During the investigation, Dunca also traveled to Aurora, Colorado and Missouri where he engaged in EBT fraud.
- Florin Mareata is a 25-year-old citizen of Romania. Mareata is unlawfully present in the United States. He also has no confirmed employment. Mareata traveled to Las Vegas, California and Washington to pick up more than $390,000 in fraudulently obtained goods, using stolen SNAP benefits to place online orders and make in-store purchases.
- Giovanni Spirea is a 28-year-old citizen of Italy. He is unlawfully present in the United States. He has no confirmed employment. He worked closely with his wife, Santa-Madalina Costache, to fraudulently obtain goods using stolen EBT data.
- Nicolas Barbosu is a 25-year-old citizen of Romania. He is unlawfully present in the United States. He has no confirmed employment. He has traveled throughout Washington, Oregon, and California to fraudulently obtain goods with stolen SNAP benefits. He is also one of the conspiracy's most prolific users of stolen SNAP benefits.

### III. LEGAL STANDARD

Under the Bail Reform Act, Title 18, United States Code, Section 3141 *et seq*., federal courts are required to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. *See* 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. *See United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990). A finding of risk of nonappearance must be supported by a preponderance of the evidence, *United States v. Winsor*,

785 F.2d 755, 757 (9th Cir. 1986), meaning the Government "must demonstrate that it is more likely than not that there is a serious *risk* that the defendant will flee, not that it is more likely than not that the defendant *will* flee." *United States v. Figueroa-Alvarez*, 681 F. Supp. 3d 1131, 1138-39 (D. Idaho 2023) (emphasis in original.)

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). As discussed below, these factors weigh heavily against pretrial release.

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); *Reem v. Hennessy*, 2018 WL 1258137, at *2 (N.D. Cal. Mar. 12, 2018); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government is entitled to proceed by proffer in detention hearings). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. *Id*. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." *Id*. (internal quotation marks omitted).

## IV.   STATUTORY FACTORS

Each of the relevant statutory factors in the detention analysis underscore that the Defendants present both an ongoing danger to the community and a serious risk of flight if released on bond.

### A.   The Nature and Circumstances of the Offenses Charged

The first factor—the nature and circumstances of the offense charged—contemplates consideration of not only the specific acts and charges alleged in the indictment, but also the potential penalty that may be imposed if the person is convicted. *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008); *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (noting defendants faced respectively penalties of 35 and 70 years if convicted).

The Defendants criminal conduct is undeniably serious. While this District is familiar with cases involving multi-million-dollar fraud schemes perpetrated by defendants who target investors seeking to profit from investments that prove too good to be true, the Defendants in this case stole from our community's most vulnerable victims. Parents struggling to feed their families and senior citizens who rely on public assistance found themselves unable to buy groceries because Defendants and their coconspirators used the victims' SNAP benefits to buy massive quantities of infant formula and energy drinks, which the Defendants and their coconspirators then resold. Simply put, Defendants' criminal conduct took food from hungry families; their victims didn't even know they had been targeted until they stood at the grocery checkout and discovered their EBT cards had been wiped clean. Unable to pay, they were forced to leave with nothing while the defendants cashed out their benefits.

The following chart attempts to capture the scope and audacity of the Defendants conspiracy by illustrating the number of transactions each of the Defendants personally conducted and the value of the goods they fraudulently obtained:

| Defendant | Date Range | Number of In-Store Transactions in Oregon and Washington | Online Transactions | Total Loss |
|---|---|---|---|---|
| Dumitru | 8/7/2023-3/14/2024 | 245 | | $46,000 |
| Miclescu | 4/4/2024-9/13/2024 | 511 | | $142,500 |

| Dunca | 12/1/2023-2/2/2024 | 95 | | $20,900 |
|---|---|---|---|---|
| Mareata | 6/1/2023-9/2/2024 | 57 | More than 2,500 | $394,000 |
| Spirea | 12/1/2023-8/22/2024 | 370 | | $55,400 |
| Barbosu | 6/11/2024-9/13/2024 | 375 | | $102,100 |

And the conspiracy as a whole moved substantially greater volumes of goods fraudulently obtained with stolen EBT benefits. Purely by reviewing shipping records for the conspiracy's Vancouver, Washington storage unit, investigators have identified at least seventeen shipments from Washington to California from September 2023 to September 2024. The total shipping weight exceeds 124,000 pounds, and the estimated value of the goods exceeds $2.4 million. The investigation is ongoing, and investigators expect to uncover additional relevant conduct.

Behind each of these fraudulent transactions and the stolen EBT account information lies real people—low-income families struggling to make ends meet under the best of circumstances. Defendants' greed exacerbated that struggle in a way that very few fraud victims have experienced. While some victims were eventually able to apply to have some of their benefits restored, that process takes time and undoubtedly failed to put food on their table the day they learned that they had been targeted by the Defendant's greed.

Moreover, the nature and circumstances of the offenses are serious, and the penalties are appropriately severe. Underscoring the seriousness of the Defendants' conduct, for each defendant, the government anticipates a base offense level under the applicable Sentencing Guidelines, prior to any departures, of 28 to 30, resulting in potential prison sentences of 78 to 121 months, providing each defendant with extra incentive to flee. *See Townsend*, 897 F.2d at 995; *see also United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (holding defendant

was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond). This fact, combined with the fact that Defendants are non-citizens unlawfully present in the United States, and that a conviction will make it practically inevitable that Defendants will subsequently be removed or deported from the United States, dramatically heightens the risk of flight.

### B. The Weight of the Evidence

The second factor is the weight of the evidence. Although § 3142(g)(2) specifically enumerates weight of the evidence as a consideration in determining release, the Ninth Circuit has held that it is to be afforded less weight than the other statutory factors. *See Townsend*, 897 F.2d at 994; *Winsor*, 785 F.2d at 757. The weight of the evidence is, however, an important and relevant consideration in the Court's evaluation of whether a defendant "will fail to appear or will pose a danger to any person or to the community. *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985).

Here, the weight of the evidence against the Defendants is strong. Every charged fraudulent EBT transaction was captured by in-store video surveillance. Store records capture the items purchased and the stolen EBT card information used to complete the transaction. Surveillance has also observed conspirators meet to collect fraudulently obtained goods, consolidate those goods at residences and storage units, and transfer them to storage units in Vancouver, Washington. Commercial shipping records establish the frequency, weight, and destination for each shipment. The shipping records describe the goods as "food," a conspirator typically signs the bill of lading, and the goods are shipped by commercial carrier to a reseller in California.

Recently executed search warrants also reveal the scope of the Defendant's criminal conduct. On October 17, 2024, surveillance observed Jessica Gonzalez, Edwin Santizo and Henandez de Estrada meet with Salvis Dunca and transfer boxes of formula from Dunca's storage unit to a U-haul truck. They drove to Public Storage in Vancouver, Washington and unloaded the boxes into two storage units. On October 22, 2024, law enforcement executed search warrants at Defendants' residences and storage units. They recovered an estimated $150,000 of stolen infant formula from the Vancouver storage units alone. From Defendants' residences, law enforcement recovered skimming devices, card encoders, large quantities of blank cards, and other evidence of access device fraud and identity theft were recovered at certain of the Defendants' residences. Large quantities and cash and gold—the proceeds of Defendants' criminal conduct—were also found by law enforcement at Defendants' residence.

Where, as here, the evidence of Defendants' guilt is strong, it provides "a considerable incentive to flee." *United States v. Millan*, 4 F.3d 1038, 1046 (2d Cir. 1993); *see also Motamedi*, 767 F.2d at 1408 (9th Cir. 1985); *United States v. Palmer-Contreras*, 835 F.2d 15, 18 (1st Cir. 1987) (where "the evidence against defendants is strong, the incentive for relocation is increased").

**C. The Defendants' History and Characteristics**

Consideration of the history and characteristics of the person under § 3142(g)(3) includes the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and whether, at the time of the current offense or arrest, the person was on

probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law. *See* § 3142(g)(3)(A) and (B).

Critically, none of the Defendants appear to have been gainfully employed at any point in the recent past. All of the Defendants are unlawfully present in the United States, and none have any employment authorization. Over the course of the government's year-long investigation, law enforcement surveillance has never observed any of the Defendants travel to and from a legitimate place of employment. Indeed, the conspiracy—that is, fraudulent transactions using vulnerable victims' stolen EBT benefits—was Defendants' full-time occupation.

Further, and as noted above, each of the Defendants is a citizen of Romania or Italy who is unlawfully present in the United States. A conviction in this case will make it practically inevitable and a virtual certainty that they will be removed or deported from the United States (indeed, as discussed herein, several of the Defendants have previously been ordered removed from the United States).

Each of these facts creates a significant risk of Defendants' non-appearance if they are released.

### D. Nature and Seriousness of the Danger to the Community

In evaluating the nature and seriousness of the danger a defendant poses to the community, the Court may consider, *inter alia*, the defendant's criminal history; whether the crimes charged required intelligence, planning, capital, facility in deception, international communications, or international motives; whether the charged crimes carry severe penalties; the defendant's prior performance on court-imposed supervision; whether the defendant illegally possessed firearms or large quantities of prohibited drugs; whether the defendant was on probation, parole, supervised release, or subject to conditions of pretrial release; and whether

there is probable cause to believe the defendant committed other crimes that are not charged. *See Townsend*, 897 F.2d at 996.

In the context of economic crimes "[t]he Ninth Circuit [has] held . . . that danger to the community may encompass pecuniary or economic harm." *United States v. Possino*, 2013 WL 1415108, at *7 (C.D. Cal. Apr. 8, 2013) (citing *United States v. Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992)); *United States v. Cohen*, 2010 WL 5387757, at *9 (N.D. Cal. Dec. 20, 2010) ("Financial harm can constitute community danger, where there is a showing that defendant's fraudulent activity is ongoing or defendant has a propensity to continue fraudulent activity."); *see also United States v. Madoff*, 586 F. Supp. 2d 240, 252 (S.D.N.Y. 2009) (discussing cases); *United States v. Parr*, 399 F.Supp. 883, 888 (W.D.Tex. 1975) ("The 'danger to . . . the community' [language in the Bail Reform Act] permits consideration of the defendant's propensity to commit crime generally, even where only pecuniary and not physical harm might result to the community at large.").

The Defendants stole from some of the community's most vulnerable victims—low-income families who rely on public assistance to feed themselves—as part of a wide-ranging and sophisticated scheme. Defendants also have no history of lawful employment, and, given their legal status, may not lawfully be employed in this country. Given this, even putting aside the significant risk of flight Defendants present, they have significant financial incentives to continue their criminal conduct, either in this community or elsewhere in the United States. Simply put, Defendants present a significant economic danger to the community, in addition to presenting a serious risk of flight.

## V. CONCLUSION

Each of the Defendants presents a danger to the community and a serious risk of flight that no set of release conditions can mitigate. For these and other defendant-specific reasons the Government will present to the Court at the detention hearings, the Government respectfully submits that the Court should enter a permanent order of detention pending trial for each defendant.

Dated: October 23, 2024.

Respectfully submitted,

NATALIE K. WIGHT
United States Attorney

*/s/ Geoffrey A. Barrow*
GEOFFREY A BARROW
NICHOLAS D. MEYERS
Assistant United States Attorneys